UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NATALIE F. LIPMAN

                      Plaintiff,

      - against -

                                **COMPLAINT**

JANE M. BARBER

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff Natalie F. Lipman ("Lipman"), by her undersigned attorney, for her complaint in this action respectfully alleges:

### Nature of the Action

      1.     This is an action for intentional infliction of emotional distress; breach of contract; breach of fiduciary duty; and declaratory judgment as to the proper interpretation of certain legal documents and the effect of defendant's conduct on her rights under those documents. Plaintiff seeks damages, attorney's fees, declaratory relief and injunctive relief.

### The Parties

      2.     Plaintiff Lipman is a citizen of the State of New York, residing at 130 Coopers Farm Road, Southampton, NY 11968, in Suffolk County.

      3.     Defendant Jane M. Barber ("Barber") is a citizen of the State of Connecticut, residing at 119 Christian Street, Bridgewater, CT 06752.

### Jurisdiction and Venue

      4.     There is complete diversity of citizenship between plaintiff and the defendant, and the amount in controversy exceeds the amount of $75,000, exclusive of interest and costs. The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(1).

5. A substantial part of the events or omissions giving rise to plaintiff's claims occurred, and a substantial part of property that is the subject of the action is situated, in this District. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2).

**Factual Allegations**

6. In 1975, Lipman entered into a committed romantic relationship with Paul J. Plishner ("Plishner"). Commencing in 1987, Lipman and Plishner resided together continuously, until Plishner's death on November 22, 2017.

7. In the 1980s, Plishner's health began rapidly to deteriorate. In 1987, Plishner suffered a serious stroke, and there was anticipation in the family that he might not survive. Lipman cared for him assiduously, however, and nursed him back to health.

8. On May 4, 1994, Plishner established The Paul J. Plishner Revocable Trust ("the Trust"), and transferred to that trust most, or substantially all, of his assets. The trustees of the Trust were Plishner, Barber and Edward F. Rodenbach ("Rodenbach"), who was Plishner's lawyer. Since then, the Trust has been amended and restated on a number of occasions. The final, and current, version of the Trust was executed on December 8, 2009.

9. Since it was first established, the Trust provided funds for the living expenses of Plishner and Lipman in New York City and Southampton.

10. In the summer of 2007, Lipman and Plishner decided to marry. Their marriage was opposed by Plishner's daughter, Barber. In part to appease Barber's opposition, Plishner insisted as a condition of their marriage that Lipman enter into a antenuptial agreement ("the Antenuptial Agreement"). The Antenuptial Agreement was duly executed by its parties on August 18, 2007.

11. Lipman and Plishner were married on August 25, 2007. On the date of their wedding, Lipman was 70 years old and Plishner was 84 years old.

12. At the time of the execution of the Antenuptial Agreement, Lipman owned a co-op apartment in New York City, and Plishner owned a house at 42 Foster Crossing in Southampton, NY (as well as other real property). The couple resided together in both homes from time to time. The Antenuptial Agreement provided Plishner with a remainder interest in Lipman's New York apartment if she predeceased him, but it provided Lipman with no property interest in any Southampton residence if he predeceased her. Instead, it provided that she would own the furniture and one-half of the books (as well as certain intellectual property) in any Southampton residence if Plishner predeceased her, and that she was to receive in the event of his death a lifetime annuity of $150,000 per year, payable quarterly.

13. Despite these terms, Plishner promised Lipman on numerous occasions that, were he to predecease her, she would be permitted to reside in their Southampton residence for the remainder of her life.

14. In or about 2013, Plishner was diagnosed with dementia with Lewy bodies. This is a neurological disease characterized by gradual and progressive loss of intellectual abilities combined with a movement disorder that resembles Parkinson's disease. Thereafter, Plishner had marked fluctuations in his ability to stay alert and awake, and also had visual hallucinations.

15. Plishner's dementia made it much more difficult for Lipman to care for him, but she continued to do so with great care and effectiveness, with the assistance of a trained caregiver.

16. In 2006, Lipman and Plishner began to live full-time in Southampton, and stopped residing in the New York City apartment. Plishner had, through the Trust, provided the expenses

of that apartment, partly because he lived there from time to time, and partly in consideration of the fact that, as alleged in paragraph 12 above, he had retained a remainder interest in that apartment in the Antenuptial Agreement.

17. In 2007, Lipman was diagnosed as suffering from Parkinson's disease. Despite her progressive disability on account of that condition, she continued to care for Plishner and to supervise all aspects of the household.

18. On April 23, 2012, Rodenbach informed Plishner and Lipman by letter that he and Barber had decided no longer to pay the upkeep of the New York City apartment. Since the letter was addressed to Plishner and Lipman, Lipman inferred that her husband had not been consulted about, or consented to, this new arrangement. Lipman would not have objected if Plishner simultaneously had relinquished his remainder interest in the apartment, which would have left Lipman free to give the apartment, if she wished, to her only son and heir, Andrew Lipman, who lives and works in New York City. Because of her husband's remainder interest, she felt she could not do so; and in the circumstances, she regarded the cutoff of support for the New York apartment as a unilateral breach of the understandings reached when the Antenuptial Agreement was entered into.

19. In 2009, Lipman and Plishner moved from 42 Foster Crossing to 130 Coopers Farm Road in Southampton, where Lipman currently resides (the "Southampton Residence"). At the time of this move, Barber promised Lipman's son, Andrew, unbidden, that if Plishner were to predecease her, Lipman would be permitted to reside in the Southampton Residence for the rest of her life. Barber was then the designated executor of Plishner's Will, and a trustee of various trusts that had been established, in part, for Lipman's benefit.

20.     In or about 2016, Barber began to insist that Plishner be transferred to a nursing home in Connecticut.  On information and belief, Barber's goal was to impair the relationship between Lipman and Plishner: Lipman's weakening physical condition would as a practical matter have made it impossible for her to visit Plishner in a nursing home so far from her residence.  Lipman refused this demand, since she wanted to remain with her husband, and because she believed that his life would be shortened if he were removed from his home, taken away from his companion of 40 years, and put into the care of strangers.

### Lipman's Retention of Counsel

21.     In April 2013, when it seemed likely that Plishner's life might be approaching its end, and as her physical condition continued to deteriorate, Lipman retained counsel to protect her interests in the event of her death or the death of her husband.  The counsel she retained was Francis Carling ("Carling"), a New York City lawyer who was an old family friend.  After meeting with Lipman and reviewing the relevant papers, Carling informed Rodenbach by email of his retention, and in the following weeks exchanged emails with Rodenbach, received letters from him, and spoke with him by telephone on at least two occasions.

22.     The gist of Carling's message to Rodenbach was that Lipman hoped that, in the event of her husband's death, the promises that she would remain in the Southampton Residence for the remainder of her life would be honored.  At that time (and at present), the Southampton Residence was fully adapted to Lipman's and Plishner's physical disabilities, whereas the New York City apartment was and is not.  Rodenbach neither confirmed nor denied that the promises had been made, but he expressed the view that the Southampton Residence was a larger house than Lipman would need if she was living without her husband.  Carling suggested that a reasonable solution might be, if Plishner died, for the Trust to sell the Southampton Residence

and purchase a smaller house in the village for Lipman. Rodenbach did not say that that would be impossible or inappropriate, but he did say that it was premature to be discussing these contingencies when it was uncertain which of Plishner or Lipman would survive the other. Carling agreed, and the lawyers agreed to put off further discussions until developments rendered such discussions necessary.

23. Carling had no further occasion to communicate with Rodenbach until November 2017, but in the interim he visited with Lipman from time to time in Southampton and stayed in touch with her by phone. At no time did Rodenbach communicate with Carling to ascertain if there had been any change in his attorney-client relationship with Lipman.

24. In October 2017, Plishner told Lipman that he regretted not making it explicit in the Antenuptial Agreement that she would be permitted to remain in the Southampton Residence for her lifetime if he predeceased her.

### Plishner's Death, and Barber's Scheme To Rid Herself of Lipman

25. On November 22, 2017, Plishner died peacefully in his sleep, in the company of his wife, at the Southampton Residence.

26. On information and belief, Barber immediately put into motion a plan to oust Lipman from her home, and to so terrorize and demoralize her that she would not resist Barber's efforts to expel her from the Plishner family or seek to enforce the promises that had been made to her.

27. For her plan to succeed, Barber had to keep Carling out of the picture for as long as possible. She therefore decided that Rodenbach, acting as her agent, would write directly to Lipman, bypassing her counsel of record, with threats so severe as to wholly demoralize and thus

6

weaken her, and to compromise her health so completely that she would not have the strength to resist Barber.

28. Rodenbach put Barber's scheme into action by writing directly to Lipman on November 28, 2017 – a mere *six days* after her beloved companion of 40 years had died in her presence – in such harsh terms as to bring about her swift collapse. The gist of Rodenbach's message in this letter (the "November 28th Letter"), in pertinent part, was as follows:

(a) He announced that he was terminating all payments for Lipman's upkeep and support, including the cost of her caretakers, effective January 1, 2018.

(b) He confirmed that Lipman was due to receive an annual annuity of $150,000, but stated that "the first check may not be issued until the settlement of Paul's estate is complete. That is expected to take at least two years."

(c) He told her that "you will need to relocate to the apartment in New York City, as soon as you can arrange it, but not before the holidays." He said she would be obliged to pay the normal expenses of a "tenant" in the house while she remained there, but he confirmed that she would not be required to pay rent, and that Plishner's Estate would pay the real estate taxes on the house.

(d) He told Lipman that "you should leave Paul's furniture … in the house when you leave."

29. The arrival of this letter by FedEx so soon after Plishner's death (and the very day after a hearse containing Plishner's ashes stopped at the Southampton Residence so that Lipman could have a final moment with him), and behind the back of her lawyer, had a devastating effect on Lipman's health and emotional well-being. Lipman believes that this was Barber's intention in having the letter sent in that manner. Since Lipman received the letter, her health and

7

emotional well-being have continued to decline.  Rodenbach has been advised of this fact on numerous occasions, but has expressed no interest in, or curiosity about, Lipman's condition.

30. The November 28th Letter was not only intended to, but did harm Lipman, and it is full of inaccuracies that heightened its deleterious effects.

31. Rodenbach's threat to withhold annuity payments for at least two years was a callous attempt to starve Lipman into submission.  Plishner's Estate has no substantial assets, and it is not clear why his Will even needed to be submitted to probate.  More importantly, the obligation to pay the annuity was an obligation of the Trust, not of the Estate, and the Trust had ample assets to meet that obligation.  Thus, withholding annuity payments until probate proceedings were completed would have been wholly unjustified.

32. Rodenbach's demand that Lipman relocate to the New York City apartment ignored the promises made by Plishner and Barber that Lipman could remain in the Southampton Residence for the remainder of her life.  In his interactions with Carling thereafter, Rodenbach never denied that those promises were made.  Carling assumed that Rodenbach's position was that the promises were legally unenforceable, but Rodenbach has never even said as much.

33. The demand that Lipman relocate to the New York City apartment also ignored the fact that that apartment would require extensive renovation to become accessible to Lipman due to her disability, and it further ignored the likely deleterious effect on Lipman's health and emotional well-being that would result from her moving from the peace and tranquility of the Village of Southampton, where she has now resided for many years, to New York City.

34. Article II, Section C.4. of the Trust provides that "My trustees shall distribute to NATALIE F. LIPMAN, if she survives me, the furniture located in any home that I may own at

8

the time of my death in Southampton, New York." Thus, Rodenbach's assertion that some of that furniture belonged to Plishner after his death was unwarranted and improper.

35. Rodenbach's sending the November 28th Letter directly to Lipman, rather than to the lawyer who he knew had been retained expressly to deal with the contingency of Plishner's death, was a grave breach of his ethical obligations as a lawyer, as codified in Rule 4.2(a) of New York's Rules of Professional Conduct for lawyers, and similar rules governing the conduct of Connecticut lawyers.

36. Rodenbach's making false statements in the November 28th Letter, and in subsequent communications with Lipman's counsel (directly, or through an agent), was a breach of his ethical obligation not to knowingly make false statements of fact or law to a third person, as codified in Rule 4.1 of New York's Rules of Professional Conduct for lawyers, and similar rules governing the conduct of Connecticut lawyers. These acts were made in his capacity as Barber's agent, and she is liable for them.

**Subsequent Dealings Between Counsel for the Parties**

37. On November 29, 2017, immediately upon learning of the November 28th Letter, Carling called Rodenbach to protest his communicating with Lipman rather than her counsel. He told Rodenbach that Lipman's receipt of his letter had had a devastating effect on her emotionally. In that call, and in subsequent communications in writing and by phone between them, Rodenbach never expressed any interest in Lipman's health or well-being, nor did he ever inquire of Carling about those subjects. In an email message of March 7, 2018, Rodenbach told Carling that Barber had no "obligation to spend the estate's (Jane's) money or time attempting to find a solution to [Natalie's] situation or making her life easier," and that it was not Barber's "obligation to lift a finger in this regard."

9

38.     The contacts between Carling and Rodenbach in 2017 concluded with a telephone call on December 14th. In that call, Carling made a concrete proposal: that Lipman be permitted to remain in the Southampton Residence for another five years (rather than for her lifetime, as had been promised), and that she would commence to pay all the expenses of the house effective January 1, 2018. Rodenbach did not reject the proposal out of hand but said that five years might be too long; that perhaps Lipman should pay rent; and that, if the proposal were accepted, there would have to be some firm guarantee that Lipman would move out at the end of the agreed term. He promised to give Lipman's proposal due consideration and said he would get back to Carling with a response.

39.     Rodenbach never spoke by telephone with Carling again until April 12, 2018, though Carling requested that he call him. He did not respond to Lipman's December 14th proposal until March 7, 2018, when he rejected the proposal by email, and made no counterproposal (as Carling had assumed that he would).

40.     In late February 2017, in a telephone call with Barber, Lipman said she was constantly reminded of her beloved husband by the presence of his things in their bedroom. Barber responded that she thought Lipman should discard the twin beds in that room, purchase a larger bed for herself, and have the room repainted. Barber at that time was a trustee of the Trust and executor of Plishner's Estate, and Lipman reasonably interpreted those comments as indicating Barber's expectation and consent that Lipman would remain in the house for at least some period, if not for her lifetime.

41.     Between December 14, 2017 and March 7, 2018, in a series of email communications, Rodenbach or his partner Daniel P. Fitzgerald ("Fitzgerald"), who was acting

10

on Barber's behalf, continued to exert pressure on Lipman by making, among others, the following false claims and threats:

  (a)  Near the end of February, Carling suggested in a telephone conversation with Fitzgerald that it might be a good idea for Barber and Lipman, in their communications with each other, to avoid discussing the legal issues that were being dealt with through their lawyers. On March 1, 2018, Fitzgerald sent an email to Carling misrepresenting that he had requested that *all* communications between Barber and Lipman cease; falsely claiming that Lipman and her son Andrew had been calling Barber "directly and repeatedly;" and advising that there should be no further communications between Barber, on the one hand, and Lipman and Andrew on the other. Until this point, and for decades, there had been close, familial relations between those parties, and regular and routine communication. Fitzgerald, acting on Barber's behalf, now decreed that these family relations should end. This was intended to inflict emotional distress on Lipman, by impairing or destroying the relations between her family and the Plishner family.

  (b)  In an email sent on February 26th, Fitzgerald stated that the annuity payments due to Lipman would not commence until she vacated the Southampton Residence. When Carling responded that failure to pay the annuity would breach the relevant agreements, Fitzgerald asserted that Lipman had breached the Antenuptial Agreement by remaining in the house after Plishner's death. This was a false statement of fact and law.

  (c)  On February 28th, Fitzgerald threatened to commence eviction proceedings against Lipman, who was still awaiting a response from Rodenbach to her proposal of December 14th, and who had been paying the expenses of the Southampton Residence since January 1, 2018 in good faith conformity with that proposal.

11

(d) On March 9th, Rodenbach sent Carling an email in which he claimed, speaking for himself and Barber, that "we have not consented to [Lipman] staying in the house even for a day." He also implied that eviction proceedings might be commenced without further warning.

42. These needlessly aggressive threats by Barber's agents were meant to terrorize Lipman, to retaliate against her for trying to remain in the Southampton Residence in accordance with Plishner's wishes and Barber's promise, and to cause her emotional distress so that she would bend to Barber's will.

43. As weeks and weeks passed after December 14, 2017, Lipman became more and more anxious due to the lack of a response from Rodenbach to her proposal. Carling tried to reassure her that "the ball was in Rodenbach's court," as it were, and that the lack of a quick rejection of her proposal gave cause for optimism that a constructive counterproposal would be forthcoming. On information and belief, Barber's delay in responding was in fact a deliberate strategy calculated to wear Lipman down, to increase her emotional distress and uncertainty, and to make her more amenable to complying with Barber's wishes.

44. At this point, Barber had been aware for many years of Plishner's wishes as to how his wife should be treated in the event of his death. On information and belief, some years before he died, Barber decided, in violation of her fiduciary duty to Plishner (and to Lipman as a beneficiary of the Trust), to thwart Plishner's wishes and to manage his affairs so as to provide maximum benefit to Barber and minimum benefit to Lipman.

45. In the March 9, 2018 email from Rodenbach to Carling referred to in paragraph 41(d) above, Rodenbach suggested that he and Barber might take action to remove Lipman from the Southampton Residence. Carling responded on March 13th:

12

> Ed, I can't forward this [email] to Natalie; I've never uttered the word "eviction" to her, and I think it would devastate her if I did. And I also think that, if you were actually to launch proceedings against her without warning and a chance for me to prepare her and calm her down, it might literally prove fatal to her in her current condition.

Rodenbach assured Carling by return email that no eviction proceeding would be commenced without warning to him. It was also arranged that any eviction papers would be served on Lipman's Southampton counsel, and not on her directly.

46. Carling then notified Rodenbach that Lipman would attempt to raise the necessary funds so that she could purchase the Southampton Residence, thus resolving the issues between the parties. Lipman proceeded to try to do so.

47. On April 9, 2018, Rodenbach duly sent notice to Carling by way of email that a New York lawyer had been retained to commence eviction proceedings against Lipman. In accordance with his March 13th email to Rodenbach, Carling did not forward this message to Lipman.

48. Within minutes of Carling's receipt of the April 9th notice, Barber took it upon herself to forward that message to Lipman, bypassing the lawyers who were trying to reach a solution on behalf of the parties. She did this to intimidate Lipman and inflict maximum emotional distress upon her. In this, she was successful.

49. The reason ultimately given by Barber for not permitting Lipman to remain in the Southampton Residence was that the Charitable Remainder Annuity Trust ("CRAT") which was to be the source of Lipman's annuity payments could not be funded in part by transfer to it of ownership of the Southampton Residence, but had to be funded in cash or marketable securities. Rodenbach claimed that there were not enough liquid assets in the Trust to transfer to the CRAT

to fund the annuity payments. Thus, according to Barber and her agents, they were required by law to sell the Southampton Residence.

50. On information and belief, the CRAT established by Plishner's counsel did not comport with the minimum requirements established by the Internal Revenue Service for such instruments. Accordingly, the CRAT was invalid, and Plishner's Estate was not required to fund it. Thus, there was no legal obstacle to Barber's permitting Lipman to remain in the Southampton Residence.

**FIRST CLAIM FOR RELIEF**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

51. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

52. By her conduct, and the conduct of her agents, described above, Barber intended to inflict, and succeeded in inflicting, intense emotional distress on plaintiff, commencing on November 28, 2017, and continuing through the date of the filing of this action and thereafter.

53. Plaintiff is entitled to an award of compensatory and punitive damages against Barber.

**SECOND CLAIM FOR RELIEF**
**(BREACH OF CONTRACT)**

54. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

55. By refusing to pay plaintiff her annuity payments when due, Barber breached the terms of Article II, Section 2.5 of the Antenuptial Agreement and Article II, Section B.2 of the Trust.

56. Plaintiff is entitled to an award of damages against Barber on account of her breach of contract, and for an award of her reasonable attorney's fees pursuant to Article V, Section 5.17 of the Antenuptial Agreement against Barber who, as executor of Plishner's Estate, should be deemed to stand in the shoes of Plishner for purposes of that provision.

### THIRD CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY DUTY)

57. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

58. Barber is a trustee of the Trust, and has a fiduciary duty to assure that its terms are implemented and fulfilled to the benefit of the Trust's beneficiaries, including Lipman.

59. Article II, Section B.2 of the Trust provides for the payment of a lifetime annuity to plaintiff in the annual amount of $150,000.

60. Barber breached the terms of the Trust and her duties as a fiduciary of the Trust by failing and refusing to make timely payments to Lipman of the annuity to which she was entitled.

61. Plaintiff is entitled to an award of damages on account of Barber's breach of her fiduciary duty.

### FOURTH CLAIM FOR RELIEF
### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

62. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

63. The Antenuptial Agreement was entered into in New York, and by its terms "shall be governed and construed under the laws of the State of New York." The Trust is governed by its terms by Connecticut law.

15

64. Under New York and Connecticut law, every contract governed by their law shall be construed as containing an implied covenant of good faith and fair dealing.

65. By her conduct, and that of her agents, described above, Barber has breached the covenant of good faith and fair dealing implied in the applicable agreements.

66. Plaintiff is entitled to an award of damages for Barber's breach.

**FIFTH CLAIM FOR RELIEF**
**(DECLARATORY JUDGMENT AS TO DISQUALIFICATION**
**OF BARBER AS A BENEFICIARY OF THE TRUST)**

67. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

68. Article VI, Section B, of the Trust provides that

> "if any beneficiary [of the Trust} … seeks to prevent the execution of any of its terms (regardless of the nature or probable cause for their actions) … then all of the terms of this Agreement benefiting such person are revoked and the property concerned is to be treated as if said beneficiary failed to survive me."

69. Article II of Plishner's Will directed his fiduciaries (including Barber) to comply with the terms of the Antenuptial Agreement. Article VI, Section B, of the Will provides similar penalties as the Trust (as set for in paragraph 68 above) for a beneficiary who seeks to prevent the execution of any of its terms.

70. By failing and refusing to make timely payments to plaintiff of the annuity provided in the Antenuptial Agreement and the Trust, Barber has violated the cited provisions of those documents.

71. Plaintiff is entitled to a declaratory judgment that Barber's breaches as set forth in plaintiff's Second, Third and Fourth Claims for Relief disqualify her, under the foregoing cited provisions, from taking or deriving any benefit as a beneficiary of the Trust or of the Will.

## SIXTH CLAIM FOR RELIEF
## (INJUNCTIVE RELIEF)

71. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

72. Barber has threatened, and continues to threaten, to commence proceedings to have plaintiff evicted from the Southampton Residence, in retaliation for her asserting her rights under the applicable Agreements and the promises made to her.

73. Plaintiff is entitled to a preliminary injunction enjoining the commencement or continuance of such proceedings, in order preserve the *status quo ante* until her claims in this action are adjudicated.

## SEVENTH CLAIM FOR RELIEF
## (DECLARATORY JUDGMENT)

74. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

75. Article II, Section 2.1(a) of the Antenuptial Agreement contains a waiver of plaintiff's right of election under New York law to take one-third of Plishner's Estate.

76. As alleged in plaintiff's Second Claim for Relief above, Barber has breached the Antenuptial Agreement by failing and refusing to make timely payments to plaintiff of the annuity to which she is entitled under that Agreement.

77. Barber's breach of the Antenuptial Agreement relieved plaintiff of her obligation to comply with its terms.

78. Plaintiff is entitled to a declaratory judgment that legally she has the options (a) to enforce the terms of the Antenuptial Agreement, or (b) to revoke the Agreement and exercise her right of election under New York law.

## EIGHTH CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE CRAT)

79. Plaintiff repeats the allegations in paragraphs 6-50 above as though fully set forth herein.

80. As alleged in paragraph 49 above, Barber has contended that she cannot allow Lipman to remain in the Southampton Residence because of the legal requirements for funding of the CRAT.

81. Plaintiff seeks a declaratory judgment of this Court as to whether the CRAT as established is valid under the Internal Revenue Code and applicable regulations, and whether there is any legal necessity for it to be funded.

WHEREFORE, plaintiff prays for judgment as follows:

(a) On her First Claim for Relief, for such compensatory and punitive damages as may be awarded by the jury.

(b) On her Second Claim for Relief, for such damages and attorney's fees as may be awarded by the jury.

(c) On her Third Claim for Relief, for such compensatory and punitive damages as may be awarded by the jury.

(d) On her Fourth Claim for Relief, for such damages as may be awarded by the jury.

(e) On her Fifth Claim for Relief, for a ruling by the Court that defendant Barber is disqualified from receiving any benefits as a beneficiary of the Trust or Will by virtue of her conduct alleged herein.

(f) On her Sixth Claim for Relief, for a temporary injunction barring Barber from continuing legal action to evict plaintiff from the Southampton Residence during the pendency of this action.

(g) On her Seventh Claim for Relief, for a ruling by the Court that Barber's breach of the Antenuptial Agreement entitles plaintiff, at her option, to seek to enforce the terms of that Agreement, or to regard the Agreement as annulled and exercise her right of election under New York law against Plishner's Estate.

(h) On her Eighth Claim for Relief, for a ruling by the Court that the CRAT as established is invalid under the Internal Revenue Code and applicable regulations, and that there is no legal necessity for it to be funded.

**Jury Trial Demand**

Plaintiff hereby demands a trial by jury of all claims and issues triable as of right to a jury.

Dated: Southampton, New York
April 23, 2018

FRANCIS CARLING

_____
(FC 1016)
174 East 74th Street, Suite 12BC
New York, NY 10021-3533
(917) 951-1237
fcarling@gmail.com

Attorney for Plaintiff